**In re James Albert JAY, Debtor.**

**James Albert Jay and Ann C. Jay, Plaintiffs,**

v.

**Nesco Acceptance Corporation, Nesco, Inc., Bank One, Oklahoma, N.A., and Linc Acquisition One, L.L.C., Defendants.**

**Bankruptcy No. 01–11000–RLJ–13. Adversary No. 02–1009.**

United States Bankruptcy Court, N.D. Texas, Abilene Division.

Sept. 30, 2003.

██ 

_____

Sammy Clay Gregory, Lubbock, TX, Jim Parker, Comanche, TX, for Plaintiffs.

James R. Jordan, Shannon, Gracey, Ratliff and Miller, Matthew M. Julius, Dallas, TX, John Y. Bonds, III, Shannon, Gracey, Ratliff and Miller, Ft. Worth, TX, for Defendants.

## MEMORANDUM OPINION

ROBERT L. JONES, Bankruptcy Judge.

The claims raised by this adversary proceeding were, at the parties' request, bifurcated for trial. Presently before the court is the claim made by James Albert Jay and Ann Jay (collectively "Jays"), seeking to cancel a deed purportedly conveying their interest in a .85 acre tract of land as an allegedly pretended sale of their business homestead in violation of the Texas Constitution. Defendants Nesco Acceptance Corp. ("Nesco Acceptance"), Nesco Inc., Bank One Oklahoma, and Linc Acquisition One ("Linc") (collectively "Nesco Defendants") argue that the .85 acre tract was not the Jays business homestead when conveyed by them to Nesco Acceptance, and that, accordingly, Nesco Acceptance has clear title to such tract. Trial on all issues concerning this claim was held on July 23, 2003.[1]

This court has jurisdiction of this matter under 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2). This Memorandum Opinion contains the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052 and FED. R. BANKR.P. 9014.

## I. FACTS

The Jays acquired title to the .85 acre tract, which abuts Interstate 20 in the City of Ranger, Texas, sometime in 1984. At that time, and through to the present, the Jays have used such tract to operate a service station and convenience store. The Jays also acquired an adjoining 1.04 acre tract, which they sometimes leased to others, or operated as a liquor store. The 1.04 acre tract was not being used by the Jays in 1999. The Jays have never resided or maintained a home on either the .85 acre tract or the 1.04 acre tract, nor have they ever intended to maintain a home on either tract.

Beginning in 1997, the Jays decided to upgrade their facilities on the .85 acre tract to allow them to better compete with their competition. In November, 1999, the Jays entered into negotiations with Nesco [2] to finance the improvements on the .85 acre tract. Nesco told the Jays that conveyance of both tracts was necessary to the transaction. Mr. Jay testified that Nesco agreed to build the new facility and would "somehow" lease it back to the Jays. The first written instrument between the Jays and Nesco is the Retail Store Lease ("lease") signed on December 15, 1999. Nesco Acceptance is the landlord and the Jays are the tenants under the lease. The lease generally provides that its term would begin April 1, 2000, and run twenty

---

1. All other claims made by the parties as set forth in the Joint Pre-Trial Order will be considered by the court at a later setting.

2. Where the evidence is unclear concerning whether the party referred to is Nesco Acceptance or Nesco Inc., the court will simply refer to "Nesco."

years, with the Jays holding an option to extend such term for some period thereafter. The lease also provides the Jays with an option to repurchase both tracts at any time during the lease or upon its termination. Appended to the lease is a schedule for payments to be made by the Jays for the "[t]erm of [l]oan." The schedule reflects a "[l]oan [a]mount" of $1,281,001 with an "[a]nnual [i]nterest [r]ate" of 11%, compounded monthly. To exercise their option to repurchase the tracts, the Jays pay a flat fee (which decreases over time), plus the unpaid principal balance owing under the schedule at the time they exercised the option.

The Jays closed down operations on the .85 acre tract in late December, 1999, in preparation for demolition of the existing facilities, which began on January 1 or 2, 2000, and was completed January 7, 2000. On January 13, 2000, the Jays conveyed, by warranty deed, title to the .85 acre tract to Nesco Inc. On the same date, the Jays conveyed their interest, if any, to the 1.04 acre tract to Saul Pullman by quitclaim deed. Contemporaneously with such deed, Saul Pullman executed a warranty deed covering the 1.04 acre tract to Nesco Inc. This was structured to avoid any questions concerning title to the 1.04 acre tract given the Jays' contention that Saul Pullman, apparent owner of such tract, had acquired the 1.04 acre tract through a wrongful foreclosure. As part of the transaction, Nesco paid Saul Pullman in full for the debt apparently owing to him by the Jays. Nesco also paid other judgment liens that had been recorded against both tracts.

Construction of the new facilities on the .85 acre tract began sometime shortly thereafter. Construction was not completed within the time frame contemplated. This was due, apparently in large part, to several change orders submitted by the Jays. These change orders had the additional affect of substantially increasing the cost to Nesco of erecting the new facilities. Mr. Jay testified that he understood he was to receive $240,000 cash from Nesco upon conveyance of the two tracts. The value of the .85 acre tract and the 1.04 acre tract was, according to an appraisal done December 13, 1999, $130,000 and $176,000, respectively. Nesco, according to Jay, would satisfy liens against the tracts of approximately $60,000. The remaining equity of approximately $240,000 would then be paid by Nesco. In addition, Nesco agreed to provide $150,000 for inventory and capital. In July, 2000, Nesco did pay $50,000 to the Jays. Nesco did not pay the Jays the $240,000 equity that Mr. Jay testified they were owed. Instead, in August, 2000, Nesco Acceptance attempted to secure a new lease agreement with the Jays, and conditioned "paying" the $240,000 on the Jays agreeing to such new lease. The new lease called for an increase of monthly payments from $13,102.24 to $17,754.00.

Construction of the new facilities was eventually completed, and the Jays reopened the service station and convenience store. The Jays failed to make timely lease payments to Nesco as required by the December 15, 1999, lease.

On June 27, 2001, Nesco Inc. granted a lien to Bank One by executing a deed of trust covering the .85 acre tract. The lien was granted to secure financing provided to Nesco Inc. by Bank One. Sometime thereafter, Bank One sold its interests in the Nesco note and the deed of trust to Linc. The Jays filed a lis pendens concerning both tracts on September 23, 2002.

In June, 2001, Nesco obtained judgment in the Justice of the Peace Court Number 2, in Eastland County, granting Nesco a writ of forcible detainer and possession of the properties. The Jays subsequently appealed this judgment to the District Court

for Eastland County. The Jays filed a voluntary petition under Chapter 13 of the Bankruptcy Code on October 24, 2001. Upon filing their Chapter 13 petition, the Jays removed the state court action to federal district court, where, at that time, the Jays already had a separate action pending against Nesco. The federal district court consolidated the two actions and, by order dated March 8, 2002, referred such consolidated case, which forms the present adversary, to this court.

Nesco Inc. filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Northern District of Oklahoma, on November 26, 2001. The Jays filed a proof of claim as unsecured creditors in Nesco's Chapter 11 case. The Jays received notice of Nesco's disclosure statement, Chapter 11 plan, and of the order and notice for hearing on the disclosure statement and plan. The Jays did not file an objection to confirmation of Nesco's plan, which the Oklahoma bankruptcy court confirmed on June 6, 2003.

## II. ISSUES

A resolution of the claim under consideration involves an analysis of several questions. The issues are as follows:

1. Whether the operative date of the parties' transaction for purposes of homestead laws is January 13, 2000,—the date the deed was executed,—or whether such date may be related-back to December 15, 1999, or earlier.

2. Whether the .85 acre tract constituted the Jays' business homestead on December 15, 1999, resolution of which involves determination of:
 — when a constitutional amendment takes effect;
 — whether the amendment in this case required enabling legislation;
 — whether such constitutional amendment applied retroactively to homesteads created before its effective date; and
 — whether the .85 acre tract met the substantive requirements of a business homestead on December 15, 1999.

3. Whether the deed to the .85 acre tract executed in favor of Nesco was a pretended sale of a homestead, such as is prohibited by the Texas Constitution, resolution of which involves a determination of:
 — whether section 41.006 of the Texas Property Code provides the exclusive method of determining whether a sale is a pretended sale;
 — whether the sale, under Texas common law, was a pretended sale thereby converting the deed into a disguised mortgage; and
 — whether Nesco may nevertheless be granted an equitable lien on the property.

4. Whether the Jays' failure to object to confirmation of Nesco's plan serves as res judicata in the present litigation.

5. Whether Linc is an innocent purchaser for value.

## III. DISCUSSION

### A. Time of Conveyance

For purposes of fixing the parties' rights concerning the homestead issues involved, the court first determines the date on which the transaction in question occurred. Nesco argues that the appropriate date is January 13, 2000, the date on which the Jays executed the deed conveying title to the .85 acre tract to Nesco; the Jays argue that the operative date is December 15, 1999, the date on which the parties entered into the lease.

▮ Nesco correctly argues that, normally, "title to transferred property will vest upon execution and delivery of the deed." *Stephens County Museum Inc. v. Swenson*, 517 S.W.2d 257, 261 (Tex.1974). This general rule, however, is subject to the relation-back doctrine: *"[i]f there be no question concerning relation back*, it is held that a deed takes effect between the parties when it is delivered to the grantee." *Steed v. Crossland*, 252 S.W.2d 784, 787 (Tex.Civ.App.-Beaumont 1952, writ ref'd) (emphasis added).

▮ "The relation-back doctrine holds that an act done at one time is considered to have been done at an earlier time for the purposes of the case before the court. Like all such fictions, it enables the court to arrive at conclusions that will effectuate justice while maintaining simultaneously the appearance of logical consistency. The doctrine originated in equity but courts now apply it in any number of circumstances when is it necessary ·to effectuate justice." *Cain v. State*, 882 S.W.2d 515, 518 (Tex.App.-Austin 1994, no writ). Texas courts recognize the application of the relation-back doctrine to contracts:

> Broadly speaking, the relation-back doctrine may be applied to give effect to the parties' lawful intentions, preserve rights that would otherwise be lost, or afford a remedy when none would otherwise exist.... When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions relate back to and are authorized at the time of execution of the contract.

*Id.* at 518 (internal citation omitted) (quoting *Curry Auto Leasing Inc. v. Byrd*, 683 S.W.2d 109, 112 (Tex.App.-Dallas 1984, no writ)).

▮ Texas courts apply the relation-back doctrine regarding the execution of a deed in certain situations. *See Steed*, 252 S.W.2d at 787. For example, a correction deed normally relates back to the date of the original deed, at least as between the parties to the deed. *See, e.g., Buccaneer's Cove, Inc. v. Mainland Bank*, 831 S.W.2d 582, 584 (Tex.App.-Corpus Christi 1992, no writ). Similarly, upon performance of the conditions upon which a deed has been placed in escrow and the delivery of the deed, the title acquired relates back to the date when the deed was placed in escrow. *See, e.g., Fuqua v. Fuqua*, 528 S.W.2d 896, 898 (Tex.Civ.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.).

▮ Texas courts apply the relation-back doctrine in the context of contracts for the sale of real estate. "When real property is acquired under a contract for deed or installment contract, the inception of title relates back to the time the contract was executed, not the time when legal title is conveyed." *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722 (Tex.App.-Austin 1999, no pet.) (applying relation-back doctrine for purposes of inception of title in determining whether real property was separate or community property). Stated differently, "[w]hen the deed was executed, it related back to the date of the contract and fixed the right of appellee and appellants under the contract as of that date." *Alexander v. Anderson*, 207 S.W. 205, 208 (Tex.Civ.App.-Amarillo 1918, no writ). *Accord Jenkins v. Chambers*, 9 Tex. 167, 1852 WL 4043 *23 (1852) ("A deed executed in pursuance of a previous contract relates back to the time of the contract and covers all intermediate acts"); *Holloman v. Bishop*, 197 S.W. 1000, 1000 (Tex.Civ.App.-Amarillo 1917, no writ) ("The agents, on the 3d day of July, entered into a written contract of sale with the appellees, whereby the appellant agreed to execute a deed thereto in 30 days. *This contract we interpret as the*

*sale of the land as of that date."* (emphasis added)).[3]

■■■ Under the equitable relation-back doctrine, therefore, a deed may relate back to an earlier contract for sale for purposes of fixing the parties' rights under the law, as opposed to the actual date the deed is executed and delivered. *See id.* The question that arises then is whether the Jays and Nesco entered into a contract for the sale and lease-back of the .85 acre tract. The parties have presented the court with no "master" agreement by which they set forth their respective rights and obligations. The parties entered into no *written* contract for sale in the traditional sense. The lease appears to have been the only written agreement between the parties. Yet, at some point the Jays and Nesco had to agree that the Jays would convey the .85 acre tract to Nesco, which would then lease-back such tract to the Jays with an option to purchase. Conveyance of the deed to Nesco "legally" occurred with the execution of the deed on January 13, 2000, but, as is clear from the evidence, the parties agreed to such conveyance well before January 13.

The lease is dated December 15, 1999. Nesco is the landlord and the Jays the tenants under the lease. It certainly contemplates that Nesco is the owner of the .85 acre tract. Nesco argued at trial that the lease provided that the term of the lease would begin on April 1, 2000, and that, accordingly, the lease did not necessarily contemplate a transfer of title until such date, by which time the change in the law of urban homesteads was fully complete. This argument is irrelevant if the court invokes the relation-back doctrine, as it becomes immaterial at what date the parties effected the legal transfer of title or intended to transfer such title—such date, whether it be January 13, 2000, or April 1, 2000, relates-back to the point in time at which the parties reached their master agreement. *See Alexander,* 207 S.W. at 208; *Holloman,* 197 S.W. at 1000.

Nesco does not dispute that the lease contemplates a transfer of ownership to Nesco. Nesco only disputes the date of such transfer. Yet the fact remains that the lease agreement contemplates a transfer of ownership. As such agreement does not specifically provide for a conveyance of the property, the parties must have been acting pursuant to some other agreement or understanding concerning their rights and obligations. There is no other way that the lease, entered into December 15, 1999, makes any sense unless the parties additionally, either contemporaneously with such agreement or before such agreement, had also agreed to convey the .85 acre tract. Nesco's argument is further undercut by the fact that the Jays executed the deed on January 13, 2000, as opposed to April 1, 2000. If, in fact, Nesco was not intended to be the owner of the .85 acre tract until April 1, 2000, why execute the deed before such date?

Aside from the lease itself, overt actions undertaken by the parties prior to January 13, 2000, evidence an agreement under which the Jays would convey the .85 acre tract to Nesco. Namely, on or about January 2 or 3, 2000, Nesco commenced demolition of the old facilities, which was completed by January 7, 2000. Nesco undertook the demolition pursuant to its understanding that it was, or would shortly be, the owner of the .85 acre tract.

---

**3.** *See also Cain v. State,* 882 S.W.2d 515, 518 n. 3 (Tex.App.-Austin 1994, no writ), wherein the court, in its discussion of the relation-back doctrine, cited with approval the *Corpus Juris* *Secundum* for the proposition that "if no other equities intervene, legal effect of deed may relate back to a date earlier than its delivery."

In sum, the parties' actions leave no doubt that, on December 15, 1999, or shortly before, the Jays and Nesco finalized an agreement—albeit an oral agreement—to the effect that: the Jays would convey the .85 acre tract to Nesco, which would construct an updated service station and convenience store on such tract, and which would subsequently lease such tract back to the Jays with an option to purchase. All of the parties' subsequent actions, including entering into the lease, the demolition and construction, and, most importantly, the execution of the deed on January 13, 2000, were actions undertaken pursuant to such "master" agreement. Mr. Jay testified that he commenced negotiations with Nesco in November, 1999. December 15, 1999, merely marks a date by which such negotiations were completed and, at least in part, implemented. Accordingly, the parties entered into an oral contract for the sale of the .85 acre tract on or before December 15, 1999.[4]

 Even if the parties did not technically enter into an oral contract for sale on or before December 15, 1999, Texas law permits the court to read an implied contract into the parties' conduct in the absence of any *"express* language of contracting." *City of Houston v. First City,* 827 S.W.2d 462, 473 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (emphasis in original). Having real property as the subject matter of such implied contract does not alter this conclusion. *See, generally, Seegers v. Spradley,* 522 S.W.2d 951, 955, 957 (Tex.Civ.App.-Beaumont 1975, writ ref'd n.r.e.) (affirming jury verdict finding breach of implied oral contract for the sale of real property).

 "An implied contract arises when circumstances disclose that, according to the ordinary course of dealing and the common understanding of men, there was a mutual intent to contract." *City of Houston,* 827 S.W.2d at 473. *Accord Ishin Speed Sport Inc. v. Rutherford,* 933 S.W.2d 343, 348 (Tex.App.-Fort Worth 1996, no writ) ("There was no written contract between the parties.... Clearly, an offer and its acceptance in strict compliance with the offer's terms are essential to the creation of a binding contract.... However, even if an offer and acceptance are not recorded on paper, dealings between parties may result in an implied contract where the facts show that the minds of the parties met on the terms of the contract without any legally expressed agreement"). In this regard, "express language is not essential to a promise; conduct may equally convey an objective assent." *City of Houston,* 827 S.W.2d at 473; *Ishin Speed Sport Inc.,* 933 S.W.2d at 348. "If the finder of fact determines that one party reasonably drew the inference of a promise from the other party's conduct, then that promise will be given effect in law." *Ishin Speed Sport Inc.,* 933 S.W.2d at 348. The difference between express and implied contracts is the character and manner of proof required to established mutual assent. *See City of Houston,* 827 S.W.2d at 473. Whether mutual assent existed is a question of fact. *See id. See also Ishin Speed Sport Inc.,* 933 S.W.2d at 348.

---

**4.** The parties introduced no evidence explaining the delay between finalization of the agreement and execution of the deed. Mr. Jay testified, however, that Saul Pullman had allegedly foreclosed on the 1.04 acre tract, and that judgment liens existed on both tracts of land. Mr. Jay further testified that Saul Pullman was contacted by the parties, and executed a deed of his own in the event that there were any questions concerning true ownership. Nesco paid off the judgment liens on the properties. Thus, as is more than likely, the delay in execution of the deed was logistical. Documents had to be prepared, and Saul Pullman and others had to be contacted and persuaded to release their liens.

The facts of the present case weigh in favor of imputing an implied contract into the parties' conduct, because such conduct must have come about as the result of an implied, if not express, agreement to convey the .85 acre tract to Nesco, which would then erect improvements thereon and lease back such property to the Jays with an option to purchase. The Jays relied on the objective assent and conduct of Nesco. Thus, whether analyzed as an oral contract for sale, or as an implied contract for the same, the result is the same: on or before December 15, 1999, the parties entered into a contract pursuant to which the Jays executed the deed on January 13, 2000. In response, Nesco argues that any such oral contract is barred by the statute of frauds. Nesco's reliance on the statute of frauds is misplaced. The statute of frauds prohibits *prospective* enforcement of an oral contract to convey land. *See* TEX. BUS. & COM.CODE ANN. § 26.01(a) & (b)(4) (Vernon 2002). The statute of frauds makes such contract voidable, not void. *See Mason v. Abel*, 215 S.W.2d 377, 381–82 (Tex.Civ.App.-Dallas 1948, writ ref'd n.r.e.). *See also Scott v. Vandor*, 671 S.W.2d 79, 88 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). The statute of frauds does not retroactively invalidate performance undertaken pursuant to such a contract. *See, e.g., Enochs v. Brown*, 872 S.W.2d 312, 319 (Tex.App.-Austin 1994, no writ) ("When one party fully performs a contract, the statute of frauds is unavailable to the other who knowingly accepts the benefits and partly performs"); *Southern Bldg. & Loan Ass'n v. Jackson*, 290 S.W. 266, 268 (Tex.Civ. App.-Dallas 1926, no writ).

Nesco cannot, after conveyance, assert the statute of frauds to argue that no oral contract for such conveyance could have existed. *See id.* In the case of an oral contract for the sale of real property, "if afterwards carried into effect by a conveyance, the deed will relate back to the date of the contract." *Oakey v. Bennett*, 52 U.S. 33, 40, 11 How. 33, 13 L.Ed. 593 (1850) (construing Texas law). *Accord Murphy v. Johnson*, 439 S.W.2d 440, 444 (Tex.Civ.App.-Houston [1st Dist.] 1969, no writ) ("a trust in land declared by parol only, although wholly unenforceable against the trustee, has yet enough of vitality so that if voluntarily executed by the trustee at any time it will become validated as of the date of the original oral agreement. Such a deed is said to relate back to the oral agreement").

Having found that the parties entered into an oral or implied contract for the sale of the .85 acre tract on or before December 15, 1999, and that subsequent performance of such contract ratified the parties' agreement, the question then becomes whether the court may, and whether it in fact will, relate-back the January 13, 2000, deed to the December 15, 1999, contract. *See Jenkins v. Chambers*, 9 Tex. 167, 1852 WL 4043 *23 (1852); *Alexander v. Anderson*, 207 S.W. 205, 208 (Tex.Civ. App.-Amarillo 1918, no writ); *Holloman v. Bishop*, 197 S.W. 1000, 1000 (Tex.Civ.App.-Amarillo 1917, no writ).

As defined by the United States Supreme Court, and as adopted by Texas courts:

> by the doctrine of relation is meant that principle by which an act done at one time is considered by a fiction of law to have been done at some antecedent period. It is usually applied where several proceedings are essential to complete a particular transaction, such as a conveyance or deed. The last proceeding which consummates the conveyance is held for certain purposes to take effect by relation as of the day when the first proceeding was had.

*Gibson v. Chouteau,* 13 Wall. 92, 80 U.S. 92, 100–101, 20 L.Ed. 534 (1871), *quoted in Brandon v. Claxton,* 30 S.W.2d 679, 680 (Tex.Civ.App.-Dallas 1930), *aff'd sub nom,* 121 Tex. 184, 47 S.W.2d 263 (1932). "The doctrine of relation ... is employed only when necessary to prevent injustice that may result from happenings between the real and fictitious dates of the major event." *Brandon,* 30 S.W.2d at 680. More specifically, "the relation-back doctrine may be applied to give effect to the parties' lawful intentions, preserve rights that would otherwise be lost, or afford a remedy where none would otherwise exist." *Cain v. State,* 882 S.W.2d 515, 518 (Tex. App.-Austin 1994, no writ).

 The relation-back doctrine enables a court to effectuate justice. *See id.* As it is a creature of equity, a balancing of the equities may be required. *See, e.g., Lovato v. Austin Nursing Ctr. Inc.,* 113 S.W.3d 45, 54–55 (Tex.App.-Austin 2003, no pet.). In the present case, there can be little doubt that Nesco structured its transaction with the Jays to circumvent Texas homestead laws. Nesco offered no evidence to the contrary, nor any other explanation for why the transaction was structured as a conveyance/lease-back.

Of the grounds upon which Texas courts apply the relation-back doctrine, two are applicable to the instant case. First, applying such doctrine gives effect to the parties' intentions, because the parties believed that the .85 acre tract constituted the Jays' business homestead, and intended to treat it as such in their relationship. *See Cain,* 882 S.W.2d at 518. "When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions *relate back* to and are authorized at the time of execution of the contract." *Id.* at 517 (emphasis in original) (quoting *Cur-*

*ry Auto Leasing Inc. v. Byrd,* 683 S.W.2d 109, 112 (Tex.App.-Dallas 1984, no writ)). The parties structured their relationship as a means to circumvent the homestead laws of the State of Texas; it is just and equitable to charge both parties' with the results of such intention, as opposed to relieving one such party of such result because of a fortuitous change in the law.

Second, applying the relation-back doctrine preserves rights that would otherwise be lost, because the Jays had certain rights on December 15, 1999, which they lost by January 13, 2000. *See Cain,* 882 S.W.2d at 518. The doctrine is applied "to prevent injustice that may result from happenings between the real and fictitious dates of the major event." *Brandon,* 30 S.W.2d at 680. The Jays lost certain rights by the time that they executed the deed; rights whose loss was not contemplated by their contract with Nesco.

 Homestead exemptions are to be liberally construed in favor of the claimant. *See, e.g., McKee v. Smith,* 965 S.W.2d 52, 53 (Tex.App.-Fort Worth 1998, pet. denied) ("The Texas Supreme Court directs us to construe the business homestead exemption liberally"). The equities weigh in favor of relating back the January 13, 2000, deed to the December 15, 1999, the date by which the parties had agreed to the terms of their transaction. Doing so effectuates justice; it gives effect to the parties' intentions, and preserves rights that were lost as of January 1, 2000. The parties treated the .85 acre tract as the Jays' business homestead, and structured their relationship in a manner calculated to circumvent homestead protections. It is just and equitable to give effect to such intentions. The court therefore holds that the date on which the law fixes the parties' rights and obligations, is December 15, 1999. *See Oakey v. Bennett,* 52 U.S. 33, 40, 11 How. 33, 13 L.Ed. 593 (1850) (construing Texas

law) (holding that, with respect to an oral contract for the sale of real property, "if afterwards carried into effect by a conveyance, the deed will relate back to the date of the [oral] contract."); *Murphy v. Johnson*, 439 S.W.2d 440, 444 (Tex.Civ.App.-Houston [1st Dist.] 1969, no writ).

## B. Whether the .85 Acre Tract was the Jays' Business Homestead on December 15, 1999

 "The laws existing at the time a contract is made become a part of the contract and govern the transaction." *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 626 (Tex.1987). *Accord Estate of B.E. Griffin v. Sumner*, 604 S.W.2d 221, 230 (Tex.Civ.App.-San Antonio 1980, writ ref'd n.r.e.). This basic principle applies just as fully to the granting of a deed as it does to the signing of a contract. *See Wessely Energy Corp.*, 736 S.W.2d at 626 (analyzing statutes setting forth requirements of deed in 1954, at time that deed was executed, as opposed to requisites of deed in 1981, the time when the controversy arose); *McGahan v. Baylor*, 32 Tex. 789, 1870 WL 5685 (1870); *Alexander v. Anderson*, 207 S.W. 205, 208 (Tex.Civ.App.-Amarillo 1918, no writ) ("[w]hen the deed was executed, it related back to the date of the contract *and fixed the right of appellee and appellants under the contract as of that date*" (emphasis added)). The court must decide, therefore, whether the .85 acre tract constituted the Jays' business homestead on December 15, 1999, the date on which the parties entered into their contract.

### 1. Which Law of Business Homesteads Applied on December 15, 1999

To answer the question of whether the .85 acre tract constituted the Jays' business homestead, the court must first determine which law applied to business homesteads on December 15, 1999—an issue on which the parties disagree because of a change in the law of urban homesteads occasioned by an amendment to the Texas Constitution. The amendment changed the definition of urban homestead so as to make the .85 acre tract ineligible for homestead protection. The Jays argue that the change in the law had not been completed as of December 15, 1999, and that the old definition of homestead applies. Nesco argues that, even if one considers December 15, 1999, as the operative date, the change in the law had, by then, become final.

The applicable amendment to the Texas Constitution was presented to the voters as Proposition 6 at the November 2, 1999, general election. The people voted in favor of the amendment. In pertinent part, the proposition adopted by the voters amended section 51, article XVI, of the Texas Constitution to provide for an urban homestead which "shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business." TEX. CONST. art. XVI, § 51. Previously, section 51, article XVI, provided that the homestead "shall be used for the purpose of a home, or as a place to exercise the calling or business of the homestead claimant." TEX. CONST. art. XVI, § 51 (amended 1999).

 The key difference between the two versions for purposes of the present adversary, therefore, is that no longer can a person claim an urban business homestead without having a home there. This is accomplished through the amended section 51's use of the conjunctive: "an urban home *and* a place to exercise a calling or business." The previous version spoke in the alternative: "a home, *or* as a place to exercise the calling or business of the homestead claimant." TEX. CONST. art. XVI, § 51 (emphasis added); TEX. CONST. art. XVI, § 51 (amended 1999) (emphasis

added). The Jays have not resided on the .85 acre tract. Thus, if the amended constitutional definition of homestead applied to the .85 acre tract on December 15, 1999, the Jays may not claim the .85 acre tract as an urban or a business homestead because they at no time maintained a home on such tract. *See* TEX. CONST. art. XVI, § 51.

■ The Texas Constitution provides that an amendment thereto shall become a part thereof "[i]f it appears from the returns that a majority of the votes cast have been cast in favor of [the] amendment ... and proclamation thereof shall be made by the Governor." TEX. CONST. art. XVII, § 1. This provision has been interpreted as requiring certification of the vote, without regard to whether and when the Governor issues a proclamation. *See Torres v. State,* 161 Tex.Crim. 480, 278 S.W.2d 853, 855 (App.1955); *Wilson v. State,* 15 Tex.App. 150 (1883). Thus, an amendment to the Texas Constitution, if ratified by the voters, becomes effective when the vote is canvassed by the appropriate authority, which, in the case of constitutional amendments, is the governor. *See id.; Childress v. State,* 161 Tex.Crim. 448, 278 S.W.2d 857, 858 (App.1955); Op. Tex. Att'y Gen. No. O–2841 (1940).

The Jays argue that, on December 15, 1999, the statutory definition of urban homestead differed, and that such statutory definition controls because section 51, article XVI, of the Texas Constitution is not self-executing but, instead, depends on legislative action to be given effect. Thus, the Jays argue, the new constitutional definition of urban homestead provided by section 51, article XVI, had no effect until January 1, 2000, the date on which the new statute implementing or enabling the new section 51 took effect.

Former section 41.002(a) of the Property Code provided that, "[i]f used for the purpose of an urban home or as a place to exercise a calling or business, the [urban] homestead ... shall consist of not more than one acre." Acts 1985, 69th Leg., ch. 840, § 1, (amended 1989) (current version at TEX. PROP.CODE ANN. § 41.002(a) (Vernon 2002)). This provision, reflecting the previous version of the Texas Constitution, did not require residence at an urban homestead used as a place of business. *See id.* The amended section 41.002(a) reflects the amended section 51, article XVI, of the Texas Constitution by requiring that the urban homestead be used as an "an urban home or as both an urban home and a place to exercise a calling or business." TEX. PROP.CODE ANN. § 41.002(a) (Vernon 2002). However, the act amending section 41.002(a) provided that it is to "take effect January 1, 2000, but only if the constitutional amendment ... is approved by the voters." Act of May 28, 1999, 76th Leg., R.S., ch. 1510, § 7(a), 1999 Tex. Gen. Laws XX. Thus, the amended statutory definition of urban homestead did not take affect until January 1, 2000. *See id.*

■ As of December 15, 1999, therefore, the Texas Constitution's definition of an urban homestead differed from the statutory definition thereof. The Jays argue that the statute provides the enabling legislation to give effect to the constitutional definition, and that, accordingly, until such enabling legislation takes effect, the constitutional definition of homestead does not apply. The Jays argument is not without some merit. For example, the official remarks to Senate Bill 496, which effected the change in section 41.002(a) of the Property Code, notes that such bill is "[e]nabling legislation for SJR 22". Senate Joint Resolution 22 constituting the mechanism by which the Legislature proposed an amendment to section 51, article XVI, of the Texas Constitution. Tex. S.B.

496, 76th Leg., R.S. (1999) (Remark). Furthermore, constitutional provisions must be construed in light of the conditions existing at the time of their adoption, meaning that intent may play a role in interpreting constitutional provisions. *See, e.g., City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex.1995). Tying the statutory amendment to the constitutional amendment with a January 1, 2000 effective date for the statute is perhaps some indication that the new definition of urban homestead would not become operative until such date. Indeed, setting a date certain on the beginning of a new year provides an easy and immediately ascertainable date to the citizens of Texas.

The court rejects this argument, however. First, amended section 51 of article 16 does not, by its own terms, postpone its effectiveness until January 1, 2000. Second, the legislation that proposed the amendment to section 51, article XVI, did not mention any postponement of its effectiveness. Third, the proposition delivered to the people by which they ratified the amendment to section 51 in no way apprised the people or suggested that section 51's effectiveness would be postponed. While there may be some indication of intent to postpone the effective date of the amended section 51, the court cannot conclude that it was understood and intended by the Legislature and the people to postpone the change in the urban homestead laws until January 1, 2000.

 Implementing legislation for section 51, article XVI, of the Texas Constitution would be necessary, so as to render section 51 inoperative in its absence, if section 51 is not a self-operative or self-executing constitutional provision. *See Owens v. State,* 19 S.W.3d 480, 484 (Tex. App.-Amarillo 2000, no pet.) (holding that when "a constitutional provision is not self-executing, it is incumbent on the Legisla-

ture to enact legislation" to implement such provision). "A constitutional provision is said to be self-enacting when it supplies a rule sufficient to protect the right given or permit enforcement of the duty imposed." *Ware v. Miller,* 82 S.W.3d 795, 803 (Tex.App.-Amarillo 2002, pet. denied). *Accord Motorola Inc. v. Tarrant County Appraisal Dist.,* 980 S.W.2d 899, 902 (Tex.App.-Fort Worth 1998, no pet.). With this definition in mind, it is difficult to envision how section 51, article 16, of the Texas Constitution could be anything other than self-enacting because it provides a specific rule for determining the extent of the homestead exemption, i.e. acreage and usage. In fact, the Supreme Court of Texas has held that "the constitution as above quoted [section 51, article 16] furnishes the rule by which to determine the extent of the [homestead] exemption," thereby strongly suggesting that section 51 is self-enacting or self-executing. *Wilder v. McConnell,* 91 Tex. 600, 45 S.W. 145, 146 (1898).

The conclusion that section 51, article 16, of the Texas Constitution is self-executing is further buttressed through analogous constitutional provisions and case law. For example, the Texas Constitution provides for available taxation on all property except such as is exempt from taxation by the Constitution. *See State v. American Legion Post No. 58,* 611 S.W.2d 720, 723 (Tex.Civ.App.-El Paso 1981, no writ). In this context, section 1, article 8, of the Texas Constitution provides that certain property "shall" be exempt from ad valorem taxes. *See, e.g.,* TEX. CONST. art. VIII, § 1(d). Such mandatory constitutional exemptions have been held to be "self-executing." *American Legion Post No. 58,* 611 S.W.2d at 723. Conversely, the Texas Constitution authorizes the Legislature to exempt certain other property from taxation: "the legislature may, by

general laws, exempt from taxation public property used for public purposes ...." TEX. CONST. art. VIII, § 2. This second type of exemption from taxation has been held to be dependant on legislative action, because the Constitution does not provide the rule for its implementation—it is up to the legislature to decide whether to grant such exemption, and, if so, over what type of property. *See American Legion Post No. 58,* 611 S.W.2d at 723. To qualify for the latter 'optional' exemption, therefore, "the property must be embraced not only within the Constitutional authorization but also within the statutory exemption made pursuant to such Constitutional exemption." *Id.*

The Jays urge the court to hold that section 51, article 16, of the Texas Constitution falls within the latter example; namely, that such section is not self-executing. Yet, the constitutional provisions pertaining to exemptions from forced sale, mortgages, etc., are virtually identical to sections 1 and 2 of article 8. Section 51 of article 16 defines the type of property which is exempt from forced sale, just as section 1 of article 8 defines the type of property that is exempt from ad valorem taxation. *Compare* TEX. CONST. art. XVI, § 51, *with* TEX. CONST. art. VIII, § 1. Similarly, section 49 of article 16 provides that "[t]he Legislature shall have power ... to protect by law from forced sale a certain portion of [ ] personal property ...," just as section 2 of article 8 provides that the legislature may exempt certain property from ad valorem taxation. TEX. CONST. art. XVI, § 49.

Section 51, article 16, of the Texas Constitution prescribes the exact type of property that is exempt from forced sale, as opposed to section 49, article XVI, which is discretionary; section 51 is mandatory and provides a clear rule to protect the right given. *See, generally, Youth Camps Inc. v. Comfort Indep. Sch. Dist.,* 705 S.W.2d 333, 337 (Tex.App.-San Antonio 1986, no writ) (noting that constitutionally mandated exemptions are self-executing). Indeed, the Supreme Court of Texas has stated, albeit in dicta, that the homestead provisions of the Texas Constitution are self-operative and require no enabling legislation to take effect. *See Bingham Trigg v. State of Texas,* 49 Tex. 645, 1878 WL 9205 *5 (Tex.1878). As additionally noted, where constitutional language "is general, as the language of constitutions usually is, and where such language is used to restrain action—*as restraining execution from taking the homestead, (defining the homestead,)* ...—it may well be held to be self-operating." *Missouri, Kansas & Tex. R.R. Co. v. Texas & St. Louis R.R. Co.,* 10 F. 497, 503 (C.C.N.D.Tex.1882) (emphasis added).

Amended section 51, article XVI, therefore, required no enabling or implementing legislation to effect its provisions. *See id.* It took effect immediately upon the governor's canvassing of the votes.[5] As of December 15, 1999, therefore, the Texas Constitution required that an urban homestead be used for the purposes of a home, or as a home and a place of business. On the same date, however, the then applicable version of section 41.002(a) of the Property Code did not require that an urban homestead be used for the purposes of a home. This variance between the constitutional and the statutory definitions of urban homestead raises the question of whether the statute applies notwithstanding such variance. In other words, was the Texas Legislature free, at that time, to provide a

5. The court has found no public record of the canvassing of the votes. For purposes of this opinion, the court assumes it was done short-ly after the election and, in any event, prior to December 15, 1999.

definition for an urban homestead different from the constitutional definition thereof?

■ The answer to this question must be in the negative. "When given the power to implement constitutional provisions, the legislature may define terms *which are not defined in the constitution itself,* provided its definitions constitute reasonable interpretations of the constitutional language and do not do violence to the plain meaning and intent of the constitutional framers." *Swearingen v. City of Texarkana,* 596 S.W.2d 157, 160 n. 1 (Tex.Civ. App.-Texarkana 1979, writ ref'd n.r.e.) (emphasis added). *Accord Owens v. State,* 19 S.W.3d 480, 484 (Tex.App.-Amarillo 2000, no pet) ("The Legislature may define terms which are not defined in the Constitution itself"); *Schwenke v. State,* 960 S.W.2d 227, 233 (Tex.App.-Corpus Christi 1997, pet. denied). Texas courts have therefore held that the Legislature lacks the power to enlarge or modify constitutionally defined homesteads: "[w]hen the constitution provides that the homestead ... shall not exceed $2,000 in value, any law or statute that directly or indirectly contravenes this provision is, pro tanto, nugatory." *Walker v. Darst,* 31 Tex. 681, 1869 WL 4748 *4 (1869). *Accord Wilder v. McConnell,* 91 Tex. 600, 45 S.W. 145, 146 (1898) ("the constitution ... furnishes the rule by which to determine the extent of the exemption"). The Texas Constitution, as of December 15, 1999, defined an urban homestead as requiring the maintenance of a home; any statutory variance of such definition to the effect that a home was not required was unconstitutional. *See Walker,* 31 Tex. 681, 1869 WL 4748 at *4; *Swearingen,* 596 S.W.2d at 160 n. 1.

The result is that, as of December 15, 1999, the change in Texas law was complete—an urban homestead could not be had without the maintenance of a home thereon. Yet, it is for a different reason altogether, and one unaddressed by the parties, that the previous definition of urban homestead nevertheless applied to the .85 acre tract as of December 15, 1999.

■ An amendment to the Texas Constitution altering the definition of a homestead may be made retroactive as to homesteads created before the constitutional amendment. *See Taylor v. Knostman (In re John Taylor Co.),* 935 F.2d 75, 78 (5th Cir.1991); *Dallas Power & Light Co. v. Loomis,* 672 S.W.2d 309, 310 (Tex. App.-Dallas 1984, writ ref'd n.r.e.) (holding that amendment enlarging dollar value of urban homestead exemption from five to ten thousand dollars was "intended to be retroactive," where such amendment provided for exemption of up to ten thousand dollars "at the time of [homestead's] designation.") Thus, homestead designated in 1954 at the time of five thousand dollar exemption, but then worth ten thousand dollars, was entitled to ten thousand dollar exemption after the 1970 amendment because, *at the time of its designation,* it was worth ten thousand dollars. The legislature may likewise grant retroactive effect to a change in the definition of homestead. *See In re Starns,* 52 B.R. 405, 413 (S.D.Tex.1985). However, in the absence of any such constitutional or statutory provision granting retroactive effect, the general law in Texas is that changes to the homestead definitions have only prospective effect. In other words, property that has attained the status of homestead does not lose its status as such when the homestead laws are changed so as to have made such property ineligible for homestead protection in the first instance, unless and until the Constitution or the Legislature grants retroactive effect to such change.[6]

6. To quote from a treatise on this subject:

As a general rule, changes in the Texas

In the old Texas Supreme Court case of *Linch v. Broad,* the Supreme Court of Texas considered an issue similar to the one in the present case. *Linch v. Broad,* 70 Tex. 92, 6 S.W. 751 (1888). In *Linch,* the property attained status as a homestead in 1859, at which time the homestead exemption was $2,000. *Id.* at 754. In 1876, the homestead exemption was raised to $5,000. *See id.* The court refused to apply the $5,000 exemption. *See id.* at 755. In pertinent part, the court reasoned that "[t]he provision of the present constitution enlarging the homestead exemption cannot be given a retroactive application ... so as to embrace in 1877 all property which in 1859 did not exceed in value the enlarged exemption prescribed by the constitution of 1876, without regard to value in 1877." *Id.*

The United States District Court for the Northern District of Texas considered a similar issue in *Valley Bank,* which was affirmed without opinion by the Fifth Circuit. *Valley Bank of Nevada v. Skeen,* 401 F.Supp. 139 (N.D.Tex.1975), *aff'd mem.,* 532 F.2d 185 (5th Cir.1976). The issue in *Valley Bank* was whether to apply the exemption amount in effect at the time that the homestead attained its status as such, or whether to apply the subsequently enlarged exemption value as provided by constitutional amendment: the "exemption at the time the homestead was designated was $5,000. In 1970[ ] the exemption was raised to $10,000." *Id.* at 139. Largely in reliance on *Linch v. Broad,* the court held that "the $5,000 figure which was the exemption in effect when this property was designated a homestead *must* govern." *Id.* at 140 (emphasis added). *Accord Abramson v. Bobbitt (In re Bobbitt),* 3 B.R. 372, 373 (N.D.Tex.1976) ("the Bankruptcy Court incorrectly applied a $10,000 exemption to the bankrupts' claim of an urban homestead. The exemption in effect in August, 1969, at the time the homestead was established was $5,000. The subsequent increase of the exemption to $10,000 became effective on November 3, 1970, and was not made retroactive").

■ The facts in *Valley Bank* parallel the facts of the present case because, as in *Valley Bank,* the transaction in question occurred after the constitutional amendment. *Valley Bank of Nevada v. Skeen,* 401 F.Supp. 139, 139 (N.D.Tex.1975), *aff'd mem.,* 532 F.2d 185 (5th Cir.1976). As such, *Valley Bank* is directly on point, and speaks to the central issue.[7] Thus, while it

Constitution do not have a retroactive effect. However, the Texas Legislature specifically provided that the 1983 amendment that eliminated the valuation method of limiting urban homesteads in favor of area limitations is to be retroactively applied. * * *

Prior to the 1983 constitutional change, Texas did not retroactively apply changes made to the constitution. However, the 1983 change carried with it the explicit mandate to retroactively apply the new method of determining urban homesteads and exclude the valuation method.

The major effect the 1983 change has had on homestead claimants is that urban homesteads that were once exempt if the land was under the $10,000 limit may now be partially subject to creditor's claims.

*See* 39 Tex. Prac., Marital Property and Homesteads § 25.8 (footnotes omitted) (and cases cited therein). The treatise makes the point that, but for the legislation granting retroactive applicability, the 1983 constitutional changes would not have affected urban homesteads previously acquired. *See id.*

7. Although the Fifth Circuit affirmed *Valley Bank* without opinion, the circuit has spoken on this issue in dicta. In *In re Niland,* the circuit reviewed the history of the Texas homestead exemption. *Deason v. Continental Sav. Ass'n (In re Niland),* 825 F.2d 801, 806 n. 2 (5th Cir.1987). The circuit stated that, "[p]rior to the 1983 amendments to the Texas Property Code, homeowners were entitled to exempt $5,000 of the value of their [urban] homestead ... if the property was acquired

is true that the "Constitution exempts the homestead ... when it is established, but it does not guaranty that the character impressed upon the property at one time shall continue for the future," *M.H. Lauchheimer & Sons v. Saunders,* 97 Tex. 137, 76 S.W. 750, 751 (1903), it is the law in Texas that some positive action, either by constitutional or legislative provision, is required to divest property of its homestead character—a change in the definition of homestead, without more, will not effect the character of a homestead previously acquired. *See id.*

▮ Both as of December 15, 1999, and January 1, 2000, the Property Code provided that "[t]he definition of a homestead as provided in this section applies to all homesteads in this state whenever created." TEX. PROP.CODE ANN. § 41.002(d) (2003).[8] As of December 15, 1999, the definition of urban homestead as provided in section 41.002(a) did not include the requirement that a home be maintained on such property. On that date, the amended section 51, article XVI of the Texas Constitution had taken effect, but it contained no language stating it operated retroactively, and did not, therefore, apply to homesteads previously acquired. *Cf. Dallas*

*Power & Light Co. v. Loomis,* 672 S.W.2d 309, 310 (Tex.App.-Dallas 1984, writ ref'd n.r.e.) (holding that amendment enlarging exemption value of urban homestead was clearly intended to apply retroactively, that is, to homesteads acquired before such amendment, because such amendment spoke in terms of value of the property "at the time of [its] designation." Such or similar language is absent from the 1999 amendment to section 51, article XVI). On January 1, 2000, the statutory definition of urban homestead changed, and, by operation of the above-quoted subsection (d), all homesteads, regardless of when created, became subject to the new definition of urban homestead.

As of January 1, 2000, therefore, the .85 acre tract lost any status it previously held as an urban homestead. It did not loose such status, however, by mere operation of the constitutional amendment standing alone because such amendment did not specifically provide that it applied to homesteads then in existence. Rather, it was by operation of section 41.002(d) that the .85 acre tract lost its status as urban homestead, and then only on January 1, 2000, the effective date of the new subsection (a).[9] Thus, as of December 15, 1999,

---

prior to 1971, and $10,000 if the property was acquired after 1971." *Id.* This statements lends further support to the conclusion that a change in the constitutional definition of homestead does not affect homesteads previously created, unless such amendment is granted retroactive application.

8. Initially, the mere fact that the Legislature enacted this provision is further evidence of the general Texas law that a change in the constitutional definition of homestead, without more, does not deprive property of its previously acquired homestead status.

9. While the .85 acre tract lost its character as a business homestead on January 1, 2000, because of 41.002(d), it lost such character only with respect to transactions entered into

after such date. In other words, section 41.002(d) could not have applied to a transaction entered into previously, because any such retroactive change would have altered the substantive rights and obligations of the parties as they existed under the law on December 15, 1999, such law having been incorporated into the parties' contract. Any such retroactive change would violate the Texas Constitution's prohibition against ex post facto laws. *See, e.g., Hartman v. Urban,* 946 S.W.2d 546, 551 (Tex.App.-Corpus Christi 1997, no writ) ("The substantive rights and duties of a party pursuant to an agreement are those under the law as it existed at the time the agreement was made. A subsequent law that changes those rights and duties would violate the Texas Constitution's prohibition against ex post facto laws").

the definition of urban homestead was that provided by the predecessor to the present section 51, article XVI, which does not require the maintenance of a home on urban property used as a business.

### 2. Whether the .85 Acre Tract met the Definition of Urban Business Homestead

As the new constitutional definition of urban homestead did not apply to the .85 acre tract on December 15, 1999, the question next becomes whether, on that date, such tract constituted the Jays' urban business homestead. The previous version of section 51, article XVI, of the Texas Constitution—the one in effect immediately prior to the 1999 constitutional amendment—defined an urban homestead as property, of not more than one acre, located in a city, town, or village, which is "used for the purpose of a home, or as a place to exercise the calling or business of the homestead claimant." TEX. CONST. art. XVI, § 51 (amended 1999). The previous version of section 41.002(a) of the Property Code applied this constitutional definition in virtually identical form. The specific date the Jays allege that the .85 acre tract became their urban homestead is irrelevant because section 41.002(d) of the Property Code applied such former definition of urban homestead "to all homesteads in this state whenever created." Even if the .85 acre tract allegedly became the Jays' urban homestead prior to the previous constitutional and statutory definitions thereof, such previous constitutional and statutory provisions govern the issue of whether the .85 acre tract constituted the Jays' business homestead on December 15, 1999.

The .85 acre tract is less than one acre in size, and the parties agree that such tract is located in a city, town, or village. Nevertheless, Nesco argues that such tract did not constitute the Jays' business homestead because the Jays failed to introduce evidence of intent to claim such tract as their business homestead. The homestead claimant bears the initial burden of establishing the homestead character of property. *See Bradley v. Pacific Southwest Bank (In the Matter of Bradley)*, 960 F.2d 502, 507 (5th Cir.1992). "To meet this initial burden of proof, the claimant must 'show a combination of both overt acts of homestead usage and the intention on the part of the owner to claim the land as a homestead.'" *Id.* (quoting *Sims v. Beeson*, 545 S.W.2d 262, 263 (Tex.Civ.App.Tyler 1976, writ ref'd n.r.e.)). Once the claimant meets this initial burden of proof, the burden shifts to the creditor to disprove the continued existence of a homestead. *See In the Matter of Bradley*, 960 F.2d at 507. Whether property is a homestead is a question of fact. *See Brown v. Bank of Galveston*, 963 S.W.2d 511, 515 (Tex.1998).

The claimant's initial burden is a "short hurdle." *In the Matter of Bradley*, 960 F.2d at 507. With respect to Nesco's argument that the Jays failed to prove intent to claim the .85 acre tract as a business homestead, "[i]n the usual case, mere evidence of 'overt acts of homestead usage' is sufficient to meet this burden. As long as the claimant can demonstrate that she has used her property for homestead purposes, then the Texas courts will presume that the homestead claimant possesses the requisite intent. Possession and use of land by one who owns it and who resides upon it makes it the homestead in law and in fact." *Id.* (internal quotation omitted). Specifically, "*investigation of intention need not be made when the land is actually put to homestead use. Such actual use is the most satisfactory and convincing evidence of intention.*" *Lifemark Corp. v. Merritt*, 655 S.W.2d 310, 315

(Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.) (emphasis added). *Accord In the Matter of Bradley,* 960 F.2d at 507. Evidence of intention might be material in situations where the homestead claimant owns multiple tracts of land exceeding the maximum permissible acreage. *See, e.g., In the Matter of Bradley,* 960 F.2d at 508 n. 9.

A business homestead exists if the claimed property is used for the principal business of the homestead claimant. *See Hughes v. Team Bank (In re Hughes),* 172 B.R. 205, 209 (Bankr.N.D.Tex.1993) (McGuire, C.J.). The property must be "essential and necessary" for the business of the homestead claimant. *Id. Accord Ford v. Aetna Ins. Co.,* 424 S.W.2d 612, 616 (Tex.1968). Property that is incidentally useful or profitable to the business does not qualify as a business homestead. *In re Kang,* 243 B.R. 666, 669 (Bankr. N.D.Tex.1999) (Felsenthal, J.). "Thus, the court must determine if the head of the family has a calling or business to which the property is adapted and reasonably necessary and, then, if the property is actually used as the place to exercise that calling or business." *Id.*

The term "business," as used in the context of the business homestead, is "that which occupies one's time, attention, and labor as his chief concern; that which one does for livelihood, occupation, employment." *In re Finkel,* 151 B.R. 779, 782 (Bankr.W.D.Tex.1993) (quoting *Waggener v. Haskell,* 89 Tex. 435, 35 S.W. 1, 2 (1896)). Mr. Jay testified that he operated a convenience store and service station on Interstate 20, in Ranger, Texas, for the past twenty years. He testified that he personally worked at the store, and that he oversaw its operations. He further testified that the store and service station was the primary business of himself and his family, and that he derived income from

such business. Owning and operating a convenience store qualifies as a business. *See In re Kang,* 243 B.R. at 669, (citing C.D. *Shamburger Lumber Co. v. Delavan,* 106 S.W.2d 351, 356 (Tex.Civ.App.-Amarillo 1937, writ ref'd)). Similarly, owning and operating a gasoline service station qualifies as a business. *See, e.g., Moore v. Neyland,* 180 S.W.2d 658, 659 (Tex.Civ. App.-Texarkana 1944, no writ). Thus, Mr. Jay used the .85 acre tract as a place to exercise his business within the contemplation of the business homestead exemption.

Furthermore, the property was reasonably necessary to enable the Jays' to carry on their business—that of owning and operating a convenience store and service station. The .85 acre tract is adapted for use as a convenience store and service station. Photographs introduced into evidence reveal that a store with large refrigerators, snack shelves, and coffee stations existed on the .85 acre tract on December 15, 1999. The property contained parking spaces and public restroom facilities. Such adaptation of the property is consistent with carrying on the business of a convenience store. *See In re Kang,* 243 B.R. at 670 (noting that operation of convenience store as business homestead requires "the store's premises and customer parking facilities"). The evidence further reveals that the property contained large underground fuel tanks, fuel pumps, a covered fueling area, and large signs advertising the property as a Fina service station. Such improvements and fixtures are consistent with use of the property as a service station. The .85 acre tract was thus adapted for use as a service station, and was reasonably necessary to the maintenance of such a business. *See Moore,* 180 S.W.2d at 659.

Accordingly, the Jays met their initial burden of proving that they used the .85 acre tract for business homestead pur-

poses, i.e. overt acts of homestead usage. Texas law therefore presumes intent, meaning that investigation of the Jays' intention to use the property as a business homestead is unnecessary. *See In the Matter of Bradley,* 960 F.2d at 507; *In re Hughes,* 172 B.R. at 210 n. 5. Nesco argues that the evidence demonstrates that the Jays did not have the requisite intent to claim the .85 acre tract as their business homestead on December 15, 1999. The Jays met their initial burden of proving overt acts of homestead usage, thereby obviating the need to consider intention in the context of the Jays' burden. The burden then shifted to Nesco to prove that the .85 acre tract was not, in fact, the Jays' business homestead because of an absence of the requisite intent. *See In the Matter of Bradley,* 960 F.2d at 507; *In re Finkel,* 151 B.R. at 783 ("in Texas, the burden is on the objecting creditor to disprove the business homestead").

Nesco advances three arguments to support its argument that the Jays did not have the requisite intent to claim the .85 acre tract as their business homestead: (1) the Jays permitted the ".85 acre tract [to] [become] encumbered with a judgment lien for a private debt, that the Jays never took any action to remove it, and allowed the lien to be paid off with the proceeds of the sale to Nesco as if the lien was a valid, enforceable lien, as testified to by James Jay"; (2) the Jays failed to file a designation of homestead; and (3) the Jays, at that time, owned two adjoining tracts of land exceeding one acre in total size, making intent and designation of homestead all the more relevant as the Jays were entitled to claim only one such tract as their business homestead. Nesco's Letter Brief of July 25, 2003.

■■■ Mr. Jay admitted that a judgment lien was filed against the .85 acre tract, apparently by a Mr. Shell. Other than this testimony, there is no evidence concerning such judgment lien. In the absence of such evidence, it is impossible to consider the Jays' failure to dispute such lien as evidence of a lack of intention to claim the .85 acre tract as a business homestead. Texas law permits certain liens to be filed against a business homestead, such as vendor's or materialman's liens. *See XXX; Moore v. Bank of Commerce (In re Moore),* 93 B.R. 480, 483–84 (Bankr.N.D.Tex.1988). Furthermore, while the filing of a designation of homestead is probative of intent, such filing is by no means a prerequisite to the establishment of a business homestead, nor is it determinative of intent. *See, e.g., Blake v. Fuller,* 184 S.W.2d 148, 151 (Tex.Civ.App.-Dallas 1944, no writ). *See also In re Howard,* 65 B.R. 498, 501–02 (Bankr.W.D.Tex. 1986). Finally, it is true that the Jays owned a 1.04 acre tract on December 15, 1999, and that the Jays could not have claimed both the .85 acre tract and the 1.04 tract as a business homestead. However, Nesco offered no evidence suggesting that the Jays considered the 1.04 acre tract as their business homestead. In fact, the evidence suggests the opposite: such tract could not have been claimed as wholly exempt since it exceeds one acre in size; Saul Pullman foreclosed on such tract; and Mr. Jay testified that he had not operated any business on such tract since at least 1995.

The court rejects the arguments advanced by Nesco regarding the Jay's lack of intent to claim the .85 acre tract as their business homestead. *See In the Matter of Bradley,* 960 F.2d at 507. Accordingly, as of December 15, 1999, and under the previous law governing the establishment of a business homestead, the .85 acre tract constituted the Jays' business homestead: such tract was located in a city, town or village; such tract was one acre in size or

smaller; the Jays carried on their business at such location; and such tract was adapted for, and reasonably necessary to, the maintenance of the Jay's business.

### C. Whether the Transaction with Nesco was a Sham Transaction

The Texas Constitution provided on December 15, 1999, and still provides, that "[a]ll pretended sales of the homestead involving any condition of defeasance shall be void." TEX. CONST. art XVI, § 50(c). Similarly, the Texas Property Code provided on December 15, 1999, and currently provides, that:

(a) Except as provided by Subsection (c), any sale or purported sale in whole or in part of a homestead at a fixed purchase price that is less than the appraised fair market value of the property at the time of the sale or purported sale, and in connection with which the buyer of the property executes a lease of the property to the seller at lease payments that exceed the fair rental value of the property, is considered to be a loan with all payments made from the seller to the buyer in excess of the sales price considered to be interest subject to Title 4, Finance Code.

(b) The taking of any deed in connection with a transaction described by this section is a deceptive trade practice under Subchapter E, Chapter 17, Business & Commerce Code, and the deed is void and no lien attaches to the homestead property as a result of the purported sale.

(c) This section does not apply to the sale of a family homestead to a parent, stepparent, grandparent, child, stepchild, brother, half brother, sister, half

sister, or grandchild of an adult member of the family.

TEX. PROP.CODE ANN. § 41.006 (Vernon 2002).

Nesco contends that the Jays introduced no evidence that the lease payments called for by the December 15, 1999, lease exceeded the fair rental value of the property. Thus, Nesco argues, the Jays failed to meet their burden under section 41.006. This argument assumes, however, that section 41.006 is the only source of a remedy for a sham transaction of the type alleged to have occurred.

### 1. Whether Section 41.006 Provides Exclusive Remedy

■ Texas courts have historically construed the constitutional prohibition against pretended sales of the homestead under conditions of defeasance to include situations where the owner conveys the property to a purchaser, who then leases the property back to the original owner with an option to purchase. Texas courts employ equity to look past the literal language of a deed to ascertain the true intention of the parties, namely, whether the parties intended the deed, otherwise absolute on its face, to in fact be a mortgage. The Supreme Court of Texas reaffirmed this state of the law on February 11, 1987, with its holdings in the case of *Johnson v. Cherry,* 726 S.W.2d 4 (Tex.1987).

Section 41.006 was added by the Texas Legislature in 1987, to be effective as of September 1 of that year.[10] Section 41.006 was apparently added by the Texas Legislature in order to codify the holding of *Johnson v. Cherry. See* Phillip D. Weller, *Annual Survey of Texas Law Part I: Pri-*

---

10. Section 41.006 was amended in 1999. The substance of this amendment was to change the previous reference to Texas Civil Statutes to the Texas Finance Code, in order

to reflect the ongoing process of codifying Texas statutes into labeled volumes. *See* Act Effective Sept. 1, 1999, 76th Leg., R.S., ch. 62, § 7.84, XXXX.

*vate Law Real Property,* 42 Sw. L.J. 295, 310 (1988). Since its enactment, no published Texas opinion has applied or otherwise interpreted section 41.006. The issue, therefore, is whether section 41.006 replaces the previously developed Texas common law with respect to the conveyance of a homestead and a lease-back. In other words, does section 41.006 provide the exclusive remedy for the Jays?

▆▆▆▆ In construing a statute the court's primary purpose is to give effect to the Legislature's intent. *See Cash America Int'l Inc. v. Bennett,* 35 S.W.3d 12, 16 (Tex.2000). The Legislature has the power, when not prohibited by the Constitutions of the State of Texas or the United States, to repeal or alter common law rights and remedies. *See id.* However, "when the legislature creates a cause of action and a remedy for its enforcement, that legislation is regarded as cumulative of the common-law cause of action and remedy, unless the statute expressly or impliedly negatives the latter." *Coppedge v. Colonial Sav. & Loan Ass'n,* 721 S.W.2d 933, 938 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). Thus, "[a] statute that deprives a person of a common-law right 'will not be extended beyond its plain meaning or applied to cases not clearly within its purview.'" *Cash America,* 35 S.W.3d at 16 (quoting *Satterfield v. Satterfield,* 448 S.W.2d 456, 459 (Tex.1969)). Abrogating common law claims is " 'disfavored and requires a clear repugnance between the common law and statutory causes of action.'" *Cash America,* 35 S.W.3d at 16 (quoting *Holmans v. Transource Polymers Inc.* 914 S.W.2d 189, 192 (Tex.App.-Fort Worth 1995, writ denied)). "A statute may be interpreted as abrogating a principle of common law only when either the express terms of the statute or its necessary implications clearly indicate such an intent by the legislature." *Bruce v. Jim Walters*

*Homes Inc.,* 943 S.W.2d 121, 122–23 (Tex. App.-San Antonio 1997, writ denied), *cited with approval in Cash America,* 35 S.W.3d at 16. Repeal of a common law right or principal by implication is heavily disfavored. *See Coppedge,* 721 S.W.2d at 938.

In *Cash America,* for example, the Supreme Court of Texas considered the effect of a statute on a common law remedy: "[w]e must decide whether the [Pawnshop] Act provides the sole and exclusive remedy for a complainant seeking recovery against a pawnshop for lost pledged property." *Cash America,* 35 S.W.3d at 14. The complainant sued the pawnshop for conversion, negligence, and gross negligence—common law claims—as a result of the failure by the pawnshop to return pledged property upon repayment of the loan. *See id* at 14–15. The pawnshop objected to the jurisdiction of the court, arguing that the Texas Pawnshop Act provided the exclusive remedy to the complainant. *See id.* Such act provided that the pawnshop is to replace the pledged goods in kind, subject to approval by the Consumer Credit Commissioner. *See id.* at 16. The pawnshop, therefore, argued that the claimant had failed to exhaust her administrative remedies before bringing suit. *See id.* at 15.

The Supreme Court agreed with the court of appeals, which had held that the "[a]ct provides an alternative, not an exclusive, remedy." *Id.* The court noted that, to arrive at the intent of the Legislature, the court considers the "statute's language, history, and purposes and the consequences of alternate constructions." *Id.* at 16. Noting the disfavor with which the law treats legislative abrogation of common law principles absent clear intent to so abrogate, the court found that the Legislature did not intend to displace common law rights by enacting the Act as the exclusive remedy. *See id.*

First, noting the language of the Act, the court concluded that such language "does not indicate clearly or plainly that the Legislature intended to replace [ ] common-law remedies with the exclusive remedy" provided for by the Act. *Id.* Rather, the court found that the Legislature intended to expand the protections afforded consumers, and that such expanded protections are not inconsistent with common law protections. *See id.* A consumer could therefore elect which remedy to pursue, depending on the consumer's particular situations: "the Legislature likely intended to provide a system of recourse for pawn transactions involving small amounts for which the expense of a civil suit would not be economically feasible." *Id.* (citing previous cases wherein the courts held that the Legislature did not intend to displace common law remedies with the enactment of its own remedy). Second, the court held that interpreting the Act "as providing as an alternative rather than an exclusive remedy advances the [ ] Act's fundamental purpose, which is to protect consumers by closely regulating the pawnshop industry." *Id.* at 17. "Providing consumers with a variety of remedies is consistent with that purpose. It follows then that the Act must be read to contain pawnbrokers, not to restrict pledgors' remedies." *Id.*

Similarly, in *Coppedge*, the court of appeals considered whether the plaintiff, who had alleged that he had paid usurious interest, could simultaneously recover under both the common law action for usury and under statutory actions for usury. *Coppedge v. Colonial Sav. & Loan Ass'n*, 721 S.W.2d 933, 938 (Tex.App.-Dallas 1986, writ ref'd n.r.e.). The usury statute generally provided for a remedy consisting of three times the amount of usurious interest charged and attorney's fees. *See id.* In addition to such statutory damages, the plaintiff sought damages under the common law action for usury. *See id.* The court noted that:

> when the legislature creates a cause of action and a remedy for its enforcement, that legislation is regarded as cumulative of the common-law cause of action and remedy, unless the statute expressly or impliedly negatives the latter. Repeal of the common-law action and remedy by implication is disfavored and requires a clear repugnance between the common-law and statutory causes of action. The common-law action to recover usurious interest paid was established in Texas in [*Bexar Building & Loan Association v. Robinson*, 78 Tex. 163, 14 S.W. 227 (1890)]. Although the legislature subsequently established a statutory scheme providing for the recovery of usurious interest contracted for, charged, or received, the legislature neither expressly declared nor necessarily implied an intention to abrogate the common-law remedy. We conclude that the statutory action for usury did not repeal the common-law action established in *Robinson.*

*Id.* (internal citations omitted). The statutory action permitted "recovery of three times the amount by which the total interest contracted for, charged, or received exceeds the legal maximum, i.e., three times the amount permitted by the common law. *These two remedies are independent ...."* *Id.* (internal citation omitted) (emphasis added). However, although the court held that the statutory cause of action did not abrogate the common law action, the court denied the plaintiff a simultaneous recovery under both: "an aggrieved party is entitled to only one recovery for the same loss, even when alternative remedies exist.... Thus, they are entitled to satisfaction under either the common law or article 5069–1.06, but not both." *Id.* at 939.

Applying the above principles to the Legislature's enactment of section 41.006, it cannot fairly be stated that "the express terms of the statute or its necessary implications clearly indicate [ ] an intent [to repeal common law rights] by the legislature." *Bruce*, 943 S.W.2d at 122–23. Nor, for that matter, can it fairly be argued that there exists "a clear repugnance between the common law and statutory causes of action" relating to sham purchases of the homestead. *Cash America*, 35 S.W.3d at 16.

First, and most important, section 41.006 contains no language of repeal or exclusivity. The Texas Legislature knows how to enact legislation that it intends to be exclusive of all other actions. For example, the Texas Penal Code provides that "[c]onduct does not constitute an offense unless it is defined as an offense by statute...." TEX. PEN.CODE ANN. § 1.03(a) (Vernon 2002). The express import of this provision is to repeal all common law crimes, and to replace such crimes with statutorily defined conduct. *See, e.g., State v. Randle*, 41 Tex. 292, 1874 WL 8052 *2 (1874). Similarly, Texas' version of the U.C.C. provides that "this chapter [Sales] applies to transactions in goods." TEX. BUS. & COM.CODE ANN. § 2.102 (Vernon 2002). Such provision has been interpreted as displacing common law rules regarding breach of contract. *See, e.g., Glenn Thurman Inc. v. Moore Constr. Inc.*, 942 S.W.2d 768, 771 (Tex.App.-Tyler 1997, no writ). Unlike these two examples, section 41.006 contains no language to the effect that "this section governs all homestead conveyances with lease-backs." As in *Cash America*, therefore, because the language of section 41.006 "does not expressly limit a [homestead claimant's] remedy," the Legislature "simply intended to create an alternate remedy" for such claimants. *Cash America*, 35 S.W.3d at 16.

Indeed, section 41.006 does not govern all purported conveyances of the homestead. It speaks to a limited and specific instance, namely, when the owner sells the homestead for less than the fair market value and leases it for more than the fair rental value. Section 41.006 does not address lease-backs with purchase options, as was the case in *Johnson v. Cherry*, 726 S.W.2d 4 (Tex.1987). Yet conditions of defeasance are at the very core of Texas' constitutional prohibition on pretended sales of a homestead. *See* TEX. CONST. art XVI, § 50(c) Section 41.006 does not address the use of a "straw man," a third party who purportedly purchases the property and leases it back to the original owner on behalf of the lender who is the actual party in control, as was the case in *Orozco v. Sander*, 824 S.W.2d 555 (Tex. 1992). In short, there are other ways that parties may effectuate a pretended sale of the homestead in the form of a lease-back, which would arguably be prohibited by the Texas Constitution, but would not fit within the statutory elements of section 41.006. To interpret section 41.006 as exclusive of all other actions is unreasonable.

Second, rather than interpreting section 41.006 as limiting, the appropriate interpretation is that section 41.006 was enacted to expand on available remedies. Section 41.006 sets forth two remedies not previously addressed by the common law, and arguably outside the power of the common law to create. Section 41.006 treats payments made by the seller to the buyer as interest, presumably to enable the seller to pursue usury damages if any such damages in fact exist. *See* TEX. PROP. CODE ANN. § 41.006(a) (Vernon 2002). In addition, section 41.006 provides that the taking of a deed in connection with a transaction defined by section 41.006 is a deceptive trade practice. *Id.* § 41.006(b). This entitles the buyer to remedies over and above those provided by the common

law, such as treble damages, costs, and attorney's fees. *See* TEX. BUS. & COM.CODE ANN. § 17.50(b). Thus, just as in *Cash America*, "the statute's language suggests that the Legislature sought to expand the protections afforded [homestead claimants], not contract them." *Cash America*, 35 S.W.3d at 16. Section 41.006's remedy is not inconsistent with common law remedies.

Third, as in *Cash America*, interpreting section 41.006 as providing an alternate rather than an exclusive remedy advances the constitutional and statutory policy of protecting homesteads by prohibiting pretended sales. *Id.* at 17. "Providing consumers with a variety of remedies is consistent with that purpose." *Id.* Rather than limit the common law principles governing pretended sales of the homestead, the Legislature merely singled out one specific mode of accomplishing such pretended sales, and provided a relatively objective and simple standard for determining whether a sale/lease-back is a bona fide sale or a pretended sale. In this respect, section 41.006 must be read as addressing a specific fact scenario, as opposed to addressing the law of pretended sales of the homestead in its entirety. *See id.*

Based on applicable Texas law, therefore, the court concludes that section 41.006 expands, and does not limit, the remedies afforded to homestead claimants. It cannot fairly be stated of section 41.006 that it clearly or by necessary implication evidences legislative intent to repeal previous common law, or to provide an exclusive remedy. If a plaintiff seeks damages under the Texas Deceptive Trade Practices Act, and if a transaction fits within the statutory elements of section 41.006, such plaintiff may seek relief thereunder. However, if a plaintiff merely seeks to cancel a deed executed as part of a pretended sale of the homestead, such plain-

tiff need not rely on section 41.006 but may, instead, revert to Texas common law as such common law interprets and applies the constitutional proscription of such pretended sales.

### 2. *Pretended Sales of the Homestead*

Texas courts have long held that an instrument written as a deed absolute on its face may, in fact, be a mortgage on homestead property in violation of the Texas Constitution. *See Johnson v. Cherry*, 726 S.W.2d 4, 6 (Tex.1987); *Loving v. Milliken*, 59 Tex. 423, 1883 WL 9191 *2–*3 (1883); *Ruffier v. Womack*, 30 Tex. 332, 1867 WL 4594 *6 (1867); *Mosher Steel & Mach. Co. v. Nash*, 6 S.W.2d 158, 162 (Tex.Civ.App.-Dallas 1928, writ dism'd w.o.j.); *Nagle v. Simmank*, 54 Tex.Civ. App. 432, 116 S.W. 862, 863 (1909, writ ref'd) (affirming finding that deed conveying business homestead was void as a pretended sale). "If there was a debt due from the grantor to the grantee, *or a loan made*, which the instrument secures, the transaction will be deemed a mortgage, let it be disguised as it may." *Loving*, 59 Tex. 423, 1883 WL 9191 at *2 (emphasis added). Texas courts employ equity to look past the language and form of a deed to determine whether such deed represents a bona fide sale or a pretended sale: "if a loan is established and not a payment of purchase money, equity construes the deed to be a mortgage." *Loving*, 59 Tex. 423, 1883 WL 9191 at *3.

"The question of whether an instrument written as a deed is actually a deed or is in fact a mortgage is a question of fact." *Johnson*, 726 S.W.2d at 6. The true consideration for a deed may be shown by parol evidence to be different from that expressed in the deed. *See id.* at 7; *Buccaneer's Cove Inc. v. Mainland Bank*, 831 S.W.2d 582, 584 (Tex.App.-Corpus Christi 1992, no writ). In fact, not only

may the court consider parol evidence, but "the courts *must* look beyond the face of the deed to ascertain the parties' intent." *Johnson,* 726 S.W.2d at 7. If a deed is executed contemporaneously with, or pursuant to, a contract or a lease, such multiple documents are "to be viewed as parts and parcels of one entire transaction." *Ruffier,* 30 Tex. 332, 1867 WL 4594 at *5. In the case of an alleged pretended sale, it is not necessary that the condition of defeasance appear in the deed itself; an option to purchase under a lease agreement suffices to create the constitutionally mandated condition of defeasance. *See Ruffier,* 30 Tex. 332, 1867 WL 4594 at *6; *Nash,* 6 S.W.2d at 161. It does not matter that, according to the documents, there is no enforceable or absolute debt owed by the grantor to the grantee, or that the grantor is under no obligation to repurchase the property. *See Johnson,* 726 S.W.2d at 6 (reversing judgment of appellate court which had held that "[w]ithout an enforceable obligation or debt, the deed could not be converted into a mortgage"). Rather, "[w]hen there is a fact finding that the parties intended the transaction to be a loan, and that finding is supported by probative evidence, the law will impute the existence of a debt." *Id.*

However, where the parties intended the sale to be genuine and absolute, albeit subject to defeasance in the form of the grantor repurchasing the property, the sale is not a pretended sale and the deed may not be converted into a mortgage. *See Hardie v. Campbell,* 63 Tex. 292, 1885 WL 4373 (1885); *Mansfield v. Orange Inv. Co.,* 260 S.W. 307, 308 (Tex.Civ.App.-Beaumont 1924, no writ). Thus not every sale of a homestead involving a condition of defeasance is void. *See id.* The intent of the parties is the most important consideration. *See Firstbank v. Pope,* 141 B.R. 115, 118–19 (E.D.Tex.1992); *Johnson,* 726

S.W.2d at 6. If the parties intended a sale to be genuine, then such sale cannot be a pretended sale so as to be prohibited by the Texas Constitution; if the parties intended the sale to act as security for a debt, such sale may constitute a pretended sale. *See, e.g., Firstbank,* 141 B.R. at 118–19; *Ketcham v. First Nat'l Bank of New Boston, Tex.,* 875 S.W.2d 753, 756 (Tex. App.-Texarkana 1994, no writ). "In order to support a judgment for the [grantors] on their deed-as-mortgage theory, all the court ... [is] required to find ... [is] that the transaction ... [is] not intended as a sale." *Bantuelle v. Williams,* 667 S.W.2d 810, 814 (Tex.App.-Dallas 1983, writ ref'd n.r.e.).

It is the job of the court to ascertain such intent, in aid of which Texas law has outlined numerous factors which the courts look to as evidence of true intent. "The true nature of the instrument is resolved by ascertaining the intent of the parties as disclosed by the contract or attending circumstances or both." *Johnson,* 726 S.W.2d at 6. Since Texas courts employ equity, no mathematical or objective rule for determining the absoluteness of a sale and the intent of the parties exists. ·*See, e.g., Loving,* 59 Tex. 423, 1883 WL 9191 at *2 ("equity looks to all the circumstances preceding and attending the execution of the instrument, and sometimes to those which have subsequently occurred").

Unlike section 41.006, Texas courts look to a variety of factors which, on balance, may or may not indicate that a deed is in fact a disguised mortgage. *See Johnson,* 726 S.W.2d at 7; *Loving,* 59 Tex. 423, 1883 WL 9191 at *2–*3. Thus, for example, the Supreme Court of Texas enumerated the following factors which it considers relevant:

The circumstances from which equity usually deduces the conclusion that a

deed in form is in reality a mortgage, are exactly those which are prominent in this case. The existence of a previous indebtedness between the parties; the need which the grantor has for money; a negotiation between the parties, in which a mortgage is discussed, though apparently refused; an agreement to furnish more money and extinguish an old debt for a deed to the property; a sale finally agreed on for much less than the property is worth; a statement of willingness by the grantee to reconvey if the money is refunded; no change in possession of the property taking place, as is always contemplated in absolute sales, without some understanding to the contrary.

Loving, 59 Tex. 423, 1883 WL 9191 at *2. Accord Ruffier, 30 Tex. 332, 1867 WL 4594 at *5–*6 (listing several "badges or indices which point to and characterize a mortgage," including: pre-existing debt or new funds advanced; property value considerably more than which grantee allegedly pays for it; and the grantor with the option or ability to regain the property). Of additional significance is the language employed by the parties: "a deed was to be given for ... what [grantee] then let [grantor] have in addition; and speaks of the money which he then let him have as a loan." Loving, 59 Tex. 423, 1883 WL 9191 at *3 (emphasis in original).

The Supreme Court of Texas analyzed the following factors in holding that the evidence supported the jury's finding that a deed was in fact a disguised mortgage:

In addition to [grantor's] testimony regarding his intentions, the evidence was that the repurchase price was exactly 10% more than the original price; the land was worth almost twice as much as the original 'sale' price; the lease price equaled exactly 9% interest on the balance of the note to [grantor's] ex-wife assumed by [grantee] and 18% interest on the alleged purchase price; [grantor] was indebted to other creditors for approximately $119,000 of the $120,000 he received from [grantee]; [grantor] was within one week of losing the land entirely; and [grantor] had told a real estate agent he was not interested in listing his property for sale ... [grantor's] testimony and the testimony of the other witnesses constitute some evidence upon which the jury could base its finding that the mortgage was disguised as a deed.

Johnson, 726 S.W.2d at 7 (internal citation omitted). The most significant factors the court considered in ascertaining the parties' interest were the testimony of the parties, the existence of an option to repurchase, and a depressed sales price. Id.

▮ With respect to the facts of the case at bar, Mr. Jay testified that he sought a loan for purposes of renovating his service station and convenience store. Mr. Jay testified that he had contacted several lenders before contacting Nesco. Nesco agreed to demolish the existing facility and to construct the new one provided the .85 acre tract and the 1.04 acre tract were conveyed to Nesco. Although Mr. Jay preferred a traditional loan, he agreed to Nesco's arrangement. There is no evidence before the court that Nesco was in the business of owning and leasing real estate. Rather, the evidence suggests that Nesco is a finance company which had its own construction crews which would build improvements that Nesco financed.

The evidence shows that the Jays had judgments entered against them; that one judgment creditor obtained a judgment lien on the 1.04 acre tract; and that, apparently, another judgment creditor obtained a judgment against both tracts of land. Nesco, as part of the transaction, paid off all such judgments. The evidence

further shows that the Jays conveyed both the 1.04 acre tract and the .85 acre tract to Nesco, but that Nesco constructed improvements upon only the .85 acre tract. The value of both tracts of land together was $306,000, of which approximately $240,000 was equity after subtracting the judgments liens recorded against the property. Although Mr. Jay testified that, as part of his agreement with Nesco, he was to be paid the $240,000 in equity, it is uncontested that Nesco never, in fact, paid such value. As of August 4, 2000, Nesco agreed to pay such amount provided the Jays execute a new lease and new personal guarantees. Moreover, Mr. Jay testified that part of his agreement included Nesco advancing $150,000 for working capital and inventory. It is uncontested that Nesco advanced only $50,000 of this money.

This evidence reveals several important considerations. First, the Jays were not *paid* for the land in question. *See Raposa v. Johnson,* 693 S.W.2d 43, 47 (Tex.App.-Fort Worth 1985, writ ref'd n.r.e.) ("deed recitals of valuable consideration, standing alone, are insufficient to prove the payment thereof"). The evidence indicates that the $240,000 in equity, which Mr. Jay testified was to be "paid" to the Jays, was included within the principal amount of the funds that the Jays were to repay in the form of rent payments. Given this scenario, the $240,000 in equity could never have been paid, even if Nesco had sent a check to the Jays for such sum, because Nesco treated such sum as a loan to be repaid by the Jays during the life of the lease. Mr. Jay also testified that the $150,000 was included by Nesco within the amortization schedule attached to the lease. Nesco's only witness, Mr. Erik Graham, who was Nesco' construction superintendent for the convenience store, did not refute Mr. Jay's testimony. Instead, Graham testified that Nesco's initial budget for the construction was slightly over one million dollars, and

that such budget did not include costs associated with purchasing the property. Yet the amortization schedule, arrived at before any additional costs of construction could have occurred, lists the initial principal balance owing as $1,267,898.76. This sum is significantly more than one million dollars, leading to the conclusion that some of this figure, at least, represents funds purportedly to have been advanced to the Jays for their equity.

Nesco offered no testimony explaining its failure to pay the Jays for the property. The Jays' exhibit 13, an August 14, 2000 letter from Nesco to the Jays, however, goes a long way towards explaining such failure. By such letter Nesco requested the Jays execute a new lease, the contents of which were not admitted into evidence. The letter shows that lease payments under the new lease would have been $17,754.00 per month, whereas the December 15, 1999, lease called for monthly payments of $13,102.24. Nesco informed the Jays that it would not pay the $240,000 unless the Jays executed the new lease.

The only reasonable inference to make from exhibit 13 is that Nesco considered the $240,000 as part of the funds it was advancing the Jays, not as purchase money, but as funds that would be repaid through lease payments. Either Nesco originally agreed to "pay" the Jays $240,000, or it did not so agree. If it did not so agree, then the Jays were never to have been paid for the property. Moreover, if it did not so agree, but with exhibit 13 offered to subsequently advance such funds, Nesco conditioned such advance on an increase in lease payments. Given no other explanation, the court can only conclude that the increased lease payments were, at least in part, to repay Nesco for the $240,000.

Alternatively, if Nesco did originally agree to "pay" the Jays $240,000, then it should have paid such regardless of costs of construction, etc. Unless, that is, the $240,000 was to be advanced to the Jays from Nesco's budget concerning the transaction as a whole. The amortization schedule attached to the lease lists the initial principal balance owing as $1,267,898.76. Increased construction costs may have left nothing with which to pay the $240,000. This would explain Nesco's failure to pay the Jays, but only if Nesco considered the $240,000 as a part of the original principal balance owing, in which case the Jays would repay such amount through lease payments. Thus, when Nesco offered to "pay" such amount to the Jays, such amount was to be included within a new principal balance owing, which would be repaid through higher lease payments. Once again, there is no other reasonable way to construe Nesco's failure to pay the $240,000, and subsequent conditioning of such payment upon the execution of a new lease.

If Nesco agreed to pay the Jays $240,000 in purchase money for the properties, it should have paid such amount regardless. That it did not pay such amount, and that it instead conditioned paying such amount on an increase in monthly lease payments, demonstrates that such amount was not intended to be purchase money, but was instead intended to be a loan of funds secured by the properties.

Similarly, it is uncontested that Nesco agreed to advance the Jays $150,000 for inventory and as working capital. As stated, Mr. Jay testified that such amount was included within the original principal balance owing, upon which monthly lease payments were calculated. Nesco introduced no evidence disputing this testimony.[11] Additionally, the Jays conveyed both the 1.04 acre tract and the .85 acre tract to Nesco, and then leased-back both tracts. Yet the Jays had no use for the 1.04 acre tract. Such tract was not integral to the operation of the Jays' convenience store and service station. Mr. Jay had not himself used such tract since 1995. Thus, the question arises, why did the Jays lease-back the 1.04 acre tract from Nesco? Once again the only reasonable answer is that the Jays did not, in fact, sell such tract to Nesco, but that such tract instead served as additional security for Nesco's loan. In other words, none of the monthly

---

11. With respect to Nesco's argument that the Jays cannot meet the requirements for relief under section 41.006 of the Property Code because they introduced no evidence of the fair rental value of the property, it should be remembered that such section requires: (1) a fixed purchase price less than the fair market value of the property; (2) the grantor executing a lease of the property; and (3) at lease payments that exceed the fair rental value of the property. TEX. PROP.CODE ANN 41.006(a) (Vernon 2002).

Element (1) is immediately met. Since Nesco was to pay no purchase price for the property, but was instead to advance funds which would be repaid through lease payments, element (1) is met.

The Jays offered no direct evidence of the fair rental value of the property. However, one can nevertheless arrive at the following logical conclusion. Fair rental value means what a reasonable and willing tenant would pay for the property. The Jays were to pay not only this amount, but in addition were to pay a monthly amount, including interest, such that $240,000 for "equity" and $150,000 for working capital would be amortized over twenty years including interest. Thus, the Jays' lease payments were greater than what they otherwise would have been just for the property itself, since their lease payments included repayment of $390,000 in loans. Accordingly, the Jays' lease payments exceeded the fair rental value of the property—whatever such fair rental value was—because fair rental value envisions paying for the use of land, not paying for the use of land and money.

lease payments to be paid Nesco went towards paying for the use of the 1.04 acre tract. How could it, when Nesco paid the Jays nothing for that property, and when Nesco expended no funds erecting any improvements on such property? Accordingly, conveyance and lease-back of the 1.04 acre tract served no purpose whatsoever, other than to provide Nesco with additional security for the funds it invested in the .85 acre tract. Alternatively, Nesco agreed to provide funds to the Jays for their "equity" in the 1.04 acre tract. Once again, though, why lease-back such tract, unless it was to repay Nesco for such funds which, consequently, constituted not a purchase price but instead an equity loan.

The lease calls for variable lease payments, tied into the Prime Rate plus 2.5% applied to the remaining principal balance owed. The lease contains a purchase option. However, consideration for exercising this purchase option is not the fair market value of the property. To purchase the property, the Jays must pay a set fee, which varies depending on the time the purchase occurs, plus the balance owing for the so-called lease payments. At the end of the lease, the Jays would owe $64,050, the fee amount, and nothing further under the lease.

The above considerations support the conclusion that the parties did not, in fact, intend the sale of the .85 acre tract to be a genuine sale, but instead intended to disguise a constitutionally prohibited mortgage. If any additional evidence in support of this conclusion in required, however, one need only to glance at the amortization schedule appended to the parties' lease. Such schedule is labeled "Schedule for Calculation of Option to Purchase." Reproduced in part, the schedule provides as follows:

Loan Amount: $1,281,001.00
Term of Loan: 240
Amortization Method: Normal, 360 D/Y

Loan Date: 04/01/2000
Annual Interest Rate: 11.00%
Interest Compounded: Monthly

| PMT | Due Date | Payment Amount | Balance |
|---|---|---|---|
| 1 | 04/01/00 | 13,102.24 | 1,267,898.76 |
| 2 | 05/01/00 | 13,102.24 | 1,266,418.93 |
| 3 | 06/01/00 | 13,102.24 | 1,264,925.53 |
| 4 | 07/01/00 | 13,102.24 | 1,263,418.44 |
| 5 | 08/01/00 | 13,102.24 | 1,261,897.54 |
| 6 | 09/01/00 | 13,102.24 | 1,260,362.69 |
| 7 | 10/01/00 | 13,102.24 | 1,258,813.77 |
| 8 | 11/01/00 | 13,102.24 | 1,257,250.66 |
| 9 | 12/01/00 | 13,102.24 | 1,255,673.22 |
| 2000 totals | | 117,920.16 | |
| * * * | | | |
| 238 | 01/01/20 | 13,102.24 | 25,848.45 |
| 239 | 02/01/20 | 13,102.24 | 12,983.15 |
| 240 | 03/01/20 | 13,102.24 | 0.0 |
| 2020 totals | | 39,306.64 | |

Debtor's ex. 6 (exhibit "B" thereto).

First, the heading reveals that Nesco intended its transaction with the Jays to be a loan. The heading to the above schedule speaks in terms of: "Loan Amount," "Term of Loan," "Loan Date,"

"Amortization Method." Second, rent was to be calculated, not on the basis of rental value, but on the basis of amortizing the "Loan Amount," including interest. Third, lease payments went towards reducing the "Balance" due, until such balance was zero. At that time, the Jays could have reacquired the property for $64,050, a sum safely assumed to be well below market value. Nesco structured the lease in a manner to recoup its investment over twenty years, with interest, at the end of which the Jays could reacquire the property for nominal value.

The consideration for the Jays was not purchase money, but a construction loan, to be repaid over twenty years, with the .85 acre tract serving as security for such loan. The consideration for Nesco was not the acquisition of investment property, to be leased out to willing lessees at the market rate and kept for appreciation in land values, but was instead interest on funds that it loaned, with such interest and principal being secured by real property.

 The parties attempted to make the sale "look" real, but "[w]hat in fact makes a sale real is to have a transaction that is intended as an actual sale." *Firstbank v. Pope*, 141 B.R. 115, 120 (E.D.Tex. 1992). Such is not the case with respect to the January 13, 2000, deed. The parties referred to their transaction as a loan, as is evident by the amortization schedule appended to the parties' lease as exhibit "B". *See, e.g., Loving v. Milliken*, 59 Tex. 423, 1883 WL 9191 *3 (1883) (finding it important that documents spoke in terms of "loan"). The Jays were never paid, nor were they to be paid, actual consideration for the .85 acre tract. *See Loving*, 59 Tex. 423, 1883 WL 9191 at *2; *See, e.g., Ketcham v. First Nat'l Bank of New Boston, Tex.*, 875 S.W.2d 753, 756 (Tex.App.-Texarkana 1994, no writ) (noting importance of whether purchase money was actually paid

to the grantor). Any remaining alleged purchase money over and above the $240,000 was actually applied to preexisting debts. *See, e.g., id.*, ("an additional factor is whether the purchase money was actually paid to the seller, or whether it was applied to pre-existing debts").

When the court looks past the language of the deed, and instead looks to the actual conduct and agreement of the parties, the January 13, 2000, deed was not intended to be an absolute conveyance of property, but was instead intended to be a mortgage on the .85 acre tract of land securing the funds advanced by Nesco for improvements, inventory, and working capital.

### D. The Deed as a Mortgage

#### 1. Cancellation of the Deed; Nesco's Claim

 The court finds that the January 13, 2000, deed is in fact a disguised mortgage. It is, therefore, appropriate for the court to cancel such deed and to cancel the lease contract. *See Johnson v. Cherry*, 726 S.W.2d 4, 5, 8 (Tex.1987); *Mosher*, 6 S.W.2d at 159. In addition, as the .85 acre tract constituted the Jays' business homestead, the court voids and cancels any purported lien on such property that the mortgage attempts to create, given Nesco's financing did not fall within one of the then available exceptions to encumbering the homestead. *See Johnson*, 726 S.W.2d at 6; *Ketcham*, 875 S.W.2d at 756.

The Supreme Court of Texas has held that "[r]estoration or an offer to restore consideration received by one seeking to cancel a deed is a condition precedent to maintaining a suit for cancellation of an instrument." *Johnson*, 726 S.W.2d at 8. Equity accomplishes such restoration automatically, without the necessity of the Jays formally offering to restore consideration. *See id.* at 8. Thus, "[i]n order for equity to convert the deed into a mortgage, equity

must also award judgment equal to [the creditor] for the [money loaned] ... and for interest." *Id.* In *Johnson,* the Supreme Court of Texas affirmed a finding that a deed was in fact a disguised mortgage, and accordingly affirmed cancellation of the deed. *Id.* The court then awards the creditor a judgment equal to the funds loaned as consideration for granting the deed. *See id.* Additionally, the court created an equitable lien in favor of the creditor against the debtor's property "not covered under the homestead exemption." *Id.*

▆▆▆ Nesco argues that, in the event that the court cancels the January 13, 2000, deed and the December 15, 1999, lease, the court should nevertheless create an equitable lien on the .85 acre tract. *See Truman v. Deason (In re Niland),* 825 F.2d 801, 814 (5th Cir.1987). The court cannot create such on exempt homestead property. *See Johnson,* 726 S.W.2d at 8. Just as in *Johnson,* the court may create such a lien on only non-homestead property. *Id. See also In re Niland,* 825 F.2d at 814. The whole of the .85 acre tract was exempt as a business homestead on December 15, 1999; the court cannot create an equitable lien in the present case. *See id.*

Accordingly, it would be appropriate to elicit evidence, at the damages hearing, considering the amount of funds actually advanced by Nesco, and the appropriate interest rate. Such amount would then constitute Nesco's claim. *See In re Niland,* 825 F.2d at 814.

**2. Confirmation of Nesco's Plan**

▆▆▆ Nesco makes the final argument that, even if the sale of the .85 acre tract to Nesco was a pretended sale, the Jays' failure to object to confirmation of Nesco's Chapter 11 plan acts as res judicata and prevents them from obtaining title to the

.85 acre tract. Nesco's argument is vague and unsupported. The plan does not specifically mention the .85 acre tract. Rather, Nesco's plan generally provides as follows:

> Confirmation will vest property of the Estate in the Liquidating Trustee free and clear of any and all liens, mortgages, Claims, encumbrances and interests of any and all Creditors, claimants and parties in interest except respecting the liens, mortgages, charges, encumbrances or interests of a Creditor holding an Allowed Secured Claim secured by such property.

Nesco ex. 68 art. VII ¶ 7.1. Presumably, Nesco argues that this provision divested the Jays of any rights or interests they may have had in the .85 acre tract. Yet such provision is conditioned upon property being property of the estate. The issue therefore is whether, on the date Nesco filed its Chapter 11 petition, the .85 acre tract was property of the estate.

▆▆▆ The Texas Constitution and Texas case law provide that a pretended deed is void, not voidable. *See* TEX. CONST. art XVI, § 50(c); *Ketcham v. First Nat'l Bank of New Boston, Tex.,* 875 S.W.2d 753, 756 (Tex.App.-Texarkana 1994, no writ). *See also In re Howard,* 65 B.R. 498, 507–08 (Bankr.W.D.Tex.1986). Similarly, an extra-constitutional mortgage on homestead property is void, not merely voidable. "A deed which is void cannot pass title even to an innocent purchaser from the grantee." *Sanchez v. Telles,* 960 S.W.2d 762, 768 (Tex.App.-El Paso 1997, writ denied).

Moreover, the order entered confirming Nesco's plan provides, with respect to the claim filed by Eastland, the City of Ranger, and the Ranger College District I.S.D. concerning past due taxes on the 1.04 acre and the .85 acre tracts, as follows:

(1) In the event the property securing the Class 5.45 Claim is determined in other litigation to be owned by NESCO, the Claim will be Allowed as a Secured Claim.... The Allowed Secured Claim will be paid on ... the earlier of one year after NESCO is determined to own the property or the date the Case is closed;

(2) In the event it is determined in other litigation that NESCO does not own the property ... the Class 5.45 Creditor will have no Claim in the Estate.

Nesco's ex. 68 at ¶ 3. The order of confirmation contemplated that Nesco's title to the .85 acre tract was in doubt, and that such title would be determined by the present adversary.

### 3. *Linc as Innocent Purchaser*

▉▉▉ Linc holds a deed of trust to the .85 acre tract. A deed of trust does not pass legal title, but only equitable title. *See, e.g., Leighton v. Leighton,* 921 S.W.2d 365, 368 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Farm Credit Bank of Tex. v. Snyder Nat'l Bank,* 802 S.W.2d 709, 713 (Tex.App.-Eastland 1990, writ denied). "In a deed of trust, the mortgagor conveys only the equitable title and retains the legal title, whereas a sale transfers legal title." *Leighton,* 921 S.W.2d at 368. A void lien does not pass title: "[a] deed which is void cannot pass title even to an innocent purchaser from the grantee." *Sanchez v. Telles,* 960 S.W.2d 762, 768 (Tex.App.-El Paso 1997, writ denied). Thus, Linc's only interest in the .85 acre tract, if it has an interest at all, is that of equitable title under a deed of trust.

▉▉▉ Under Texas law, the party claiming title under a subsequent deed has the burden of proving that it was a bona fide innocent purchaser for value, without notice of other claims to the title. *See, e.g., Bellaire Kirkpatrick Joint Venture v.*

*Loots,* 826 S.W.2d 205, 209 (Tex.App.-Fort Worth 1992, writ denied); *Phillips v. Latham,* 523 S.W.2d 19, 24 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.). Similarly, the holder of an equitable title bears the burden of proving that the subsequent purchaser of the legal title was not a bona fide purchaser. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 907 (Tex.1982). Linc, therefore, whether as the holder of equitable title, or as the holder of a subsequent deed, had the burden of proving that it was a bona fide innocent purchaser, i.e. a purchaser for value without notice of other claims to the property. In this regard, the Fifth Circuit, construing Texas law, has held that an innocent lender or purchaser may, without notice that a deed was anything other than absolute, in certain situations, rely on such deed. *See Rubarts v. First Gibraltar Bank (In the Matter of Rubarts),* 896 F.2d 107, 112–13(5th Cir.1990).

▉▉ In the present case, however, neither Linc nor any other defendant has presented any evidence to the effect that Bank One or Linc were innocent purchasers for value. The parties stipulated that, on June 27, 2001, Nesco granted a deed of trust to Bank One covering the .85 acre tract, and that Linc subsequently purchased such deed of trust and the note it secured. The parties further stipulated that the Jays filed a lis pendens on September 23, 2002.

Linc introduced no evidence or testimony to the effect that it was without actual knowledge of the Jays' claims. Linc submitted no evidence to the court concerning the date on which it purchased the deed of trust from Bank One. Such date could have been after the Jays filed their lis pendens. Likewise, Bank One introduced no evidence or testimony to the effect that it was without actual knowledge of the Jays' claims.

### E. The 1.04 Acre Tract

At trial, the Jays conceded that they have no homestead claim to the 1.04 acre tract. As the entire transaction is construed to be a pretended sale with the deed constituting a mortgage, the court construes Nesco as holding a mortgage against the 1.04 acre tract.

## IV. CONCLUSION

The parties entered into an oral contract for the sale of the .85 acre tract on or before December 15, 1999. Texas law permits a court to relate back the date a deed is executed to the date of the contract for the sale of land, or to the date of an oral contract for such sale. Thus, the January 13, 2000, deed may be related back to December 15, 1999. In such a case, the law as of December 15, 1999, becomes a part of the contract and governs the substantive issues involved, including the parties' rights and obligations.

The homestead provision of the Texas Constitution was amended, and effective, prior to December 15, 1999. Such amendment, however, did not apply to change the homestead character of homesteads acquired prior to such amendment, absent a specific provision providing retroactive effect. The January 1, 2000, change in the statutory definition of a business homestead was made retroactive. Yet, by that time, the parties had entered into their contract and were thus bound by the law then in place.

Under the previous constitutional definition of business homestead, the .85 acre tract was the Jays' business homestead. Given the evidence and under well developed Texas common law, the sale of such tract to Nesco, and the lease-back with the option to purchase, was a pretended sale of a homestead prohibited by the Texas Constitution. As a pretended sale, the deed was void ab initio, and title never passed to

Nesco. Rather, equity converts the deed to a mortgage. As Nesco could not have had a mortgage on the Jays' business homestead, any lien on the .85 acre tract is void. Nesco does have a claim against the Jays for the funds advanced. No portion of the .85 acre tract is non-exempt; Nesco's claim is not secured by the .85 acre tract.

Nesco's confirmed Chapter 11 plan does not alter this conclusion. The plan, although not objected to by the Jays, nowhere specifically purports to transfer the .85 acre tract free and clear of all claims to the post-confirmation entity, or to any other purchaser. Moreover, the order confirming the plan specifically contemplates that title to the property was subject to litigation. Finally, Linc failed to introduce any evidence to sustain its burden of proving its status as that of an innocent purchaser for value.